In re Ben L. PLECHATY, aka, Bernard
L. Plechaty, aka, B.L. Plechaty,
Debtor.

NATIONAL CITY BANK,
Plaintiff–Appellee,

v.

Ben L. PLECHATY, aka, Bernard L.
Plechaty, aka, B.L. Plechaty,
Defendant–Appellant.

BAP No. 97–8036.
Bankruptcy No. 94–14118.
Adversary No. 95–1608.

United States Bankruptcy Appellate Panel
of the Sixth Circuit.

Argued Aug. 13, 1997.

Decided Oct. 7, 1997.

Kenneth B. Baker, Javitch, Block, Eisen & Rathbone, Argued, Cleveland, OH, Saul Eisen, on Brief, for Defendant–Appellant.

Rosemary T. Milby, Weltman, Weinberg & Reis Co., Argued, Cleveland, OH, Michael S. Tucker, on Brief, for Plaintiff–Appellee.

Before: LUNDIN, RHODES, and WALDRON, Bankruptcy Appellate Panel Judges.

## OPINION

This appeal arises from the bankruptcy court's judgment determining a debt owed by Appellant Ben L. Plechaty (the "Debtor") to Appellee National City Bank ("National City") to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) (1996). We affirm.

### I. ISSUES ON APPEAL

This appeal requires a determination of the following questions:

1) Did National City delay in requiring payment of its demand note?

2) Is such a delay "an extension, renewal, or refinancing of credit" within the meaning of § 523(a)(2)?

3) Did National City rely on the false financial statement in granting the extension?

4) Was that reliance reasonable within the meaning of § 523(a)(2)(B)(iii)?

5) If all the requirements of § 523(a)(2)(B) have been satisfied, is the nondischargeable amount the entire debt plus interest?

## II. JURISDICTION AND STANDARD OF REVIEW

Determinations of nondischargeability under § 523(a) are final orders for appeal purposes. 28 U.S.C. § 158(a)(1) (1996); *National Acceptance Co. of Am. v. Bathalter* (*In re Bathalter* ), 123 B.R. 568, 571 (S.D.Ohio 1990), *aff'd,* 951 F.2d 349 (6th Cir.1991); *see also Klingshirn v. United States* (*In re Klingshirn* ), 209 B.R. 698, 700 (6th Cir. BAP 1997) ("For purposes of appeal, an order is final if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' ") (quoting *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S.Ct. 1494, 1497, 103 L.Ed.2d 879 (1989)). Appeals arising under § 158(a) may be heard by bankruptcy appellate panels, 28 U.S.C. § 158(c)(1), provided the district judges for the district in which the appeals occur have, by majority vote, authorized such appeals. 28 U.S.C. § 158(b)(6). The United States District Court for the Northern District of Ohio has authorized appeals to the Bankruptcy Appellate Panel of the Sixth Circuit.

The Debtor appeals from the bankruptcy court's oral findings of fact and conclusions of law. A trial court's oral findings of fact and conclusions of law are authorized by the Federal Rules of Bankruptcy Procedure, *see* FED.R.BANKR.P. 7052; FED.R.CIV.P. 52(a), and have been approved by the Sixth Circuit. *See Getty v. Havrilesko* (*In re Getty* ), No. 95–5555, 1996 WL 193813, at *2 (6th Cir. Apr. 19, 1996); *American Imaging Servs., Inc. v. Eagle–Picher Indus., Inc.* (*In re Eagle–Picher Indus., Inc.*), 963 F.2d 855, 862 (6th Cir.1992).

Findings of fact by the bankruptcy court are reviewed under the clearly erroneous standard. FED. R. BANKR.P. 8013; *United States v. Mathews* (*In re Mathews* ), 209 B.R. 218, 219 (B.A.P. 6th Cir.1997). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.' " *Mathews,* 209 B.R. at 219 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). This means the appellate court will defer to the trial court's findings of fact "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." FED.R.BANKR.P. 7052; FED.R.CIV. P. 52(a).

Conclusions of law are reviewed *de novo. Corzin v. Fordu* (*In re Fordu* ), 209 B.R. 854, 857 (6th Cir. BAP 1997). *De novo* means that the appellate court determines the law in question independently of the trial court's determination. *Id.*

## III. FACTS

National City Bank was the lead lender in a financial syndicate which provided loans up to $5,000,000 to Hamilton Cast Corporation, a company related to The Plechaty Companies. The loan was subject to a demand note, was secured by the inventory and receivables of Hamilton Cast, and was guaranteed by The Plechaty Companies. In the initial stages of the loan, the Debtor did not personally guarantee the debt.

As early as 1985 there were problems noted with the loan and, beginning in 1988, the arrangement was further jeopardized by the deteriorating financial condition of Hamilton Cast. Between 1988 and 1991, National City attempted to minimize its risk on the loan through various methods. In 1988, National City informed Hamilton Cast that it would no longer provide financing. In a letter dated July 20, 1989, National City and Hamilton Cast agreed that Hamilton Cast would seek to refinance the loan elsewhere.

In 1990, Hamilton Cast suffered a $700,000 loss by writing off the receivable of one of its substantial customers. This loss came at the same time National City was under pressure from Security Pacific, one of the lenders in the financial syndicate, to request immediate payment on the note. National City capped the line of credit at $1,500,000 in 1991. In that same year, Security Pacific formally requested National City to "make immediate demand upon Hamilton Cast for payment." National City responded to Security Pacific that a "course of dealing had been established ... that clearly indicated ... that a demand for payment would not be made." In later correspondence, National City in-

formed Security Pacific that National City "had never waived its right to make demand." This same position was expressed in a letter from National City to David Wright, President of The Plechaty Companies: "This loan remains payable on demand." In a subsequent letter from National City to Security Pacific, National City reasserted its position, stating "[i]t does not follow that a lack of demand ... is a waiver of those rights."

Also in 1991, National City sought both financial statements and personal guarantees from principals of Hamilton Cast and The Plechaty Companies, including the Debtor. In a letter dated March 28, 1991, National City requested the Debtor update his personal financial statement. In response, on May 14, 1991, the Debtor provided National City his personal financial statement dated April 1, 1991. At that time, the outstanding balance on the Hamilton Cast loan was $1,972,-000. The Debtor's personal financial statement listed his net worth at $27,057,000. At trial, the Debtor testified that he did not own any of the assets listed on the personal financial statement at the time the statement was presented to National City. (Tr. vol. 1, at 21.)

Following the submission of the personal financial statement, National City intensified its efforts to obtain personal guarantees. In a letter to the debtor dated July 17, 1991, National City stated that its decision "to continue to extend credit" was based in part on the Debtor's "stated intention to apply the proceeds from any personal or corporate asset sales to the debt of Hamilton." This was also reflected in the bank's term sheet, which was attached to the letter and listed the Debtor's guarantee as one factor in National City's decision.

As late as April 1, 1992, no agreement concerning the terms of the line of credit had been reached, although National City was receiving monthly payments on the loan and was negotiating with the Debtor concerning proceeds from a proposed liquidation of assets. In a letter that day to the Debtor, National City stated that Hamilton Cast's partial payments alone "are clearly not sufficient reason for the banks to continue to forbear." National City stressed the importance of receiving the Debtor's personal guarantee.

On April 2, 1992, the Debtor executed an Unconditional and Continuing Guarantee of the debt of Hamilton Cast. The personal guarantee was, by its own terms, "to induce National City ... to extend or continue to extend credit ... owing by Hamilton Corporation." National City's internal documents reflect that it delayed in requesting immediate payment of the Hamilton Cast note as a result of that guarantee. In particular, notes of National City's Corporate Criticized Asset Committee, dated May 11, 1992, state that National City had "received Ben Plechaty's guarantee in exchange for continued forbearance."

On September 21, 1992, National City made formal demand on the note to Hamilton Cast as borrower and to The Plechaty Companies as guarantor. On February 19, 1993, National City filed suit against the Debtor and The Plechaty Companies as guarantors of the Hamilton Cast debt. On March 17, 1994, the Court of Common Pleas for Cuyahoga County, Ohio entered judgment in favor of National City in the amount of $1,448,-808,63 with interest at the rate of 7% from November 5, 1993. This decision, which was appealed to the Eighth District Court of Appeals, was affirmed. *See National City Bank v. Plechaty Cos.,* 104 Ohio App.3d 109, 661 N.E.2d 227, *appeal denied,* 74 Ohio St.3d 1422, 655 N.E.2d 741 (1995).

On October 3, 1994, an involuntary Chapter 7 bankruptcy was filed against the Debtor and an Order for Relief was subsequently entered. National City filed a complaint to determine the dischargeability of the debt. The bankruptcy judge conducted a two-day trial and subsequently issued an oral decision excepting from discharge the debt in the amount determined in the Ohio court action. A judgment in accordance with that oral decision was entered on December 12, 1996. The Debtor's Notice of Appeal was filed on December 9, 1996, after the bankruptcy judge's oral decision but before the entry of judgment. *See* FED. R. BANKR.P. 8002(a).[1]

---

**1.** Rule 8002(a) states that "[a] notice of appeal

filed after the announcement of a decision or

## IV. DISCUSSION

In this appeal, the Bankruptcy Code's controlling provision, excepting from discharge a debt obtained by deceitful use of a false financial statement, provides in part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive ....

11 U.S.C. § 523(a)(2)(B).

█ To prevail under § 523(a)(2)(B), a creditor must satisfy the precatory language—the debt must be "for money, property, services, or an extension, renewal, or refinancing of credit"—and the creditor must prove each of the listed four elements. *Paterno Imports Ltd. v. McBee (In re McBee )*, 167 B.R. 827, 830 (Bankr.E.D.Va.1994). Although § 523(a)(2) refers to "an extension, renewal or refinancing of credit," the parties have restricted their arguments solely to the term *extension*. Since the parties' actions are more precisely described by the term *extension*, rather than *renewal* or *refinancing*, the Panel will likewise restrict its discussion to this term in § 523(a)(2).

It is not contested that the Debtor's personal financial statement was in writing, that it was materially false, that it was with respect to his financial condition, and that it was made or published with the intent to deceive. Rather, the Debtor's position that the bankruptcy court's decision should be reversed is presented in a series of interlaced arguments concentrating on the issues of forbearance, reliance, and damages.

## A. FORBEARANCE

The Debtor's initial arguments center around the issue of forbearance, which the Debtor asserts is an affirmative act that National City failed to establish as a matter of fact, and further asserts that, even if forbearance is established as a matter of fact, it is not sufficient to meet § 523(a)(2)'s requirement of an extension as a matter of law. The Panel rejects the Debtor's argument that an affirmative act of forbearance is the single lens through which the § 523(a)(2) issue must be viewed. Rather, the issue is whether National City established the factual predicate that it delayed requesting payment of the demand note and that such a delay constitutes, as a matter of law, an extension of credit within the ambit of § 523(a)(2).

### 1. Did National City delay in requiring payment of its demand note?

The Debtor argues National City failed to act at all, as it merely continued to do what it had done on prior occasions: allow the original signatories additional time to repay the note. The Debtor notes that the record contains National City's own correspondence stating that a "course of dealing had been established ... that clearly indicated ... that a demand for payment would not be made." The Debtor asserts National City failed to prove it considered requesting immediate payment and, thus, could not have decided to delay making such a request.

National City undertook to prove it considered requesting immediate payment of the demand note and, thereafter, made a decision to delay demand. The bankruptcy court determined the sufficiency of the proof regarding this issue. We review this finding of fact under the clearly erroneous standard. FED. R. BANKR.P. 8013.

█ Although the bankruptcy judge considered this issue contemporaneously with the issue of reliance, the oral decision establishes that he made a separate finding on the question of whether National City did in fact delay in requesting payment of the demand

order but before entry of the judgment, order, or decree shall be treated as filed after such entry

and on the date thereof." FED. R. BANKR.P. 8002(a).

note. In addition to National City's letter to the Debtor that payments being received from Hamilton Cast were "clearly not sufficient reason for the Bank to continue to forbear," and National City's Corporate Criticized Asset Committee's notes, which state that it "received Ben Plechaty's guarantee in exchange for continued forbearance," the bankruptcy judge approached this issue by considering the unique pressures that existed during the time in question:

> There's also the fact that the personal financial statement appears to have been furnished to the bank at a time when the bank was pressing either for restructuring for refinancing of the loan or threatening demand. It was being pressured by its participant in that regard....
>
> ....
>
> It's a question of really of intent and ... the standard of proof in this case is the preponderance of the evidence, and it seems to me that from the testimony of Mr. Zang, from the circumstances which were described, and particularly, the pressure from Security Pacific, that it's reasonable to conclude that the bank would've demanded payment of that loan, and in fact, might've seen itself as having very little alternative, had it been aware of the truth, which was, according to the debtor, that he had no assets at all, or at least that he didn't own any of the assets that were on the financial statement that he'd presented.

(Tr. vol. 3, at 9, 11–12.)

The bankruptcy judge's factual finding that National City did, in fact, delay in making a demand for payment of the loan is supported by the record and is not clearly erroneous.

### 2. Is such a delay "an extension, renewal, or refinancing of credit" within the meaning of § 523(a)(2)?

■ The second portion of the Debtor's forbearance argument asserts that since the debt was a demand note, which could be called at any time, even if National City did in fact delay in requesting payment on the note, such an action could not be legally sufficient to constitute an extension under § 523(a)(2). This is a question of law, which is reviewed *de novo. Fordu,* 209 B.R. at 857.

In arguing this issue, the Debtor continues to assert that because National City held a demand note, that by its terms remained due at all times, it must establish compliance with all elements of a forbearance in order to meet the requirements of an extension within the meaning of § 523(a)(2). The Debtor further asserts that to meet the requirements for a forbearance National City must demonstrate that it gave up specific rights for a specific period. The Debtor then concludes National City failed to provide such evidence. Although the analytical path proposed by the Debtor might appear secure, the Panel declines to travel it since the initial stepping stone linking forbearance and the demand note is unstable.

The term *forbearance* does not appear in § 523(a)(2). The Bankruptcy Code does not define *forbearance* and the term is used in only one section not relevant to this appeal. *See* 11 U.S.C. § 727(a)(4)(C); *see also* 18 U.S.C. § 152(6). A dictionary defines forbearance as "[r]efraining from doing something that one has a legal right to do. Giving of further time for claim at its due date." BLACK'S LAW DICTIONARY 644 (6th ed.1990).

■ The focus of this dischargeability proceeding is not whether National City's delay constituted a forbearance; rather, whether the debtor received an extension of credit which would be an exception to discharge under § 523(a)(2)(B). The statute requires only an extension. It would be contrary to logic, and to the plain meaning of the words in the statute, to require a creditor to make a formal demand and then issue a formal delay for a particular period of time to prove it extended the payment period of a demand note. Other proof can suffice in this context.

A majority of courts have concluded that a debtor who has caused a creditor to grant a delay in receiving or collecting payment that is due has received an extension of credit within the meaning of § 523(a)(2). *See John Deere Co. v. Gerlach (In re Gerlach ),* 897 F.2d 1048, 1050 (10th Cir.1990); *First Commercial Bank v. Robinson (In re Robinson ),* 192 B.R. 569, 575–76 (Bankr.N.D.Ala.1996);

*FDIC v. Cerar (In re Cerar )*, 84 B.R. 524, 529 (Bankr.C.D.Ill.1988); *First Bank v. Eaton (In re Eaton )*, 41 B.R. 800, 803 (Bankr. E.D.Wis.1984) (all holding that delay of collection constitutes an extension of credit within the meaning of § 523(a)(2)). *But see Howard & Sons, Inc. v. Schmidt (In re Schmidt )*, 70 B.R. 634, 644 (Bankr.N.D.Ind. 1986); *Drinker, Biddle & Reath v. Bacher (In re Bacher )*, 47 B.R. 825, 829 (Bankr. E.D.Pa.1985); *Cement Nat'l Bank (In re Colasante )*, 12 B.R. 635, 638 (E.D.Pa.1981) (all holding that delay of collection does not constitute an extension of credit within the meaning of § 523(a)(2)). *See also Field v. Mans (In re Mans )*, 210 B.R. 1, 6 (1st Cir. BAP 1997) (emphasizing the significance of the bankruptcy court finding, in a § 523(a)(2) context, that the creditor made a conscious decision regarding an extension of credit).

Although forbearance is one form of extension, limiting the general term *extension* to the specific requirements of a forbearance would unduly diminish, if not destroy, the term *extension*. Neither the statutory language nor controlling authority require such a restrictive result. The term *extension* is not defined in the Bankruptcy Code. When faced with statutory language where the words are not defined in the Bankruptcy Code, the Supreme Court has in numerous bankruptcy decisions relied on Black's Law Dictionary. *See, e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994); *Holywell Corp. v. Smith*, 503 U.S. 47, 53, 112 S.Ct. 1021, 1025, 117 L.Ed.2d 196 (1992); *Dewsnup v. Timm*, 502 U.S. 410, 428, 112 S.Ct. 773, 784, 116 L.Ed.2d 903 (1992); *Farrey v. Sanderfoot*, 500 U.S. 291, 296, 111 S.Ct. 1825, 1829, 114 L.Ed.2d 337 (1991). The term *extension* is defined as

> An increase in length of time specified in contract (e.g. of expiration date of lease, or due date of note).... An allowance of additional time for the payment of debts. An agreement between a debtor and his creditors, by which they allow him further time for the payment of his liabilities. A creditor's indulgence by giving a debtor further time to pay an existing debt.

BLACK'S LAW DICTIONARY 583 (6th ed.1990).

■ The term *debt* is defined by the Bankruptcy Code. *See* 11 U.S.C. § 101(12). Noth-

ing in the text of § 523(a), or any of its subparts, would exclude a demand note. No compelling authority has engrafted such a restriction onto the term *debt*. We decline to do so. It is clear that a demand note is a debt.

■ Determining National City's delay in requiring immediate payment to be within the meaning of *extension* under § 523(a)(2) is consistent with a statutory section directed to those debtor/creditor relationships in which a deceitful debtor has taken an active role in initially or subsequently obtaining value from a creditor as a result of a writing that satisfies the specific elements of § 523(a)(2)(B). The Debtor could have exercised a variety of choices in his economic relationship with National City. The Debtor could have continued to negotiate the financial statement he would provide to National City. The Debtor could have refused to provide any financial statement to National City. The Debtor could have supplied a true financial statement to National City. The Debtor, however, could not submit a false financial statement, causing National City to delay demand for payment of an obligation which was due, and then successfully assert this delay did not amount to an extension of credit under § 523(a)(2).

The bankruptcy judge considered this issue in his oral decision, stating:

> The debtors argue that the bank never agreed to call the loan. Its right to call the loan because it was a demand loan continued during the period of the restructure, and if in order for an extension to exist under 523(a)(2), it were necessary that to be a contractual commitment on the bank to forbear that didn't exist. But again, the cases appear to make it clear that the extension contemplated by section 523(a)(2) exists where the debtor or rather the creditor, because of a statement that's presented, forbears from exercising either its collection rights or its demand right.

(Tr. vol. 3, at 21.)

The Debtor received an "indulgence by a creditor giving his debtor further time to pay

an existing debt," *Gerlach,* 897 F.2d at 1050. The bankruptcy court correctly concluded National City's delay in demanding payment was an extension under § 523(a)(2).

## B. REASONABLE RELIANCE

■ The bankruptcy court's "finding of reasonable reliance is subject to review under the clearly erroneous standard." *Bank One, Lexington, N.A. v. Woolum (In re Woolum),* 979 F.2d 71, 75 (6th Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993). The issue of reasonable reliance is more completely considered as two questions: (1) Did the creditor rely on the materially false financial statement of the debtor; and (2) Was that reliance reasonable?

### 1. Did National City rely on the false financial statement in granting the extension?

■ Although this question focuses on the creditor's decision and not the debtor's intention, the bankruptcy court properly considered the totality of the circumstances surrounding the loan and the proposed restructure in determining this question. The totality of the circumstances included both the actions of the lender as well as the actions and purposes of the debtor.

■ The Debtor correctly points out that Glen Niffeck, the supervisor of the National City loan officer assigned to the Plechaty loans, testified there were no records that the Debtor's personal financial statement was presented to the loan committee. However, he also testified an extension of time in calling the note could have been approved by parties other than the loan committee. Mr. Niffeck could have approved an extension without committee oversight. Mr. Niffeck testified the personal financial statement was a factor in the decision-making process of National City.

The bankruptcy judge considered National City's actions, as well as the Debtor's motives, and stated:

As a factual matter, did the bank rely on the financial statement[?] The debtor argues that the bank didn't rely, that it

pursued a course of action that had resulted previously and—in substantial monthly pay-downs, which ended up paying the loan down by some three hundred thousand or more, and that this was to the benefit of the bank, and it simply pursued a course of action that it had pursued previously. And of course, it's true that it's impossible to prove reliance categorically. . . .

There's also the fact that the only apparent reason why the debtor, who is obviously intelligent and a successful businessman would present a totally false financial statement would be to achieve some end, and the only apparent end is and was to forestall demand by the bank. The bank committee reports, during this period that the work-out was attempted, at or about the April/May period of '91 through at least the April period of '92, that the bank was focusing on the prospect of achieving the payout of the loan despite it being under water, based upon the refinancing— or the sale, rather of North Coast Cable, and it's apparent that the enterprise would've been both futile and ridiculous had the bank, in fact, known that the debtor didn't own North Coast Cable. So that I find that, in fact, the bank relied upon that personal financial statement and viewed it as a justification for proceeding with the restructuring effort and withholding demand.

(Tr. vol. 3, at 10–12.) The bankruptcy judge's finding that National City relied upon the Debtor's financial statement when it delayed in requesting payment on the demand note is adequately supported in the record. Under these circumstances, the bankruptcy court's findings on this issue are not clearly erroneous.

### 2. Was that reliance reasonable within the meaning of § 523(a)(2)(B)(iii)?

■ The Debtor argues that, even if National City relied on the false financial statement, that reliance was not reasonable because there were "red flags" indicating that the statement was false. The Debtor asserts that National City had in its possession information that would have demonstrated that the 1991 personal financial statement of the

Debtor differed significantly from prior information, thus negating the reasonableness of any reliance. The information in National City's possession included a personal financial statement of the Debtor dated November 1, 1987 showing a net decrease of over $18,000,000 in his net worth between 1987 and 1991.

The Sixth Circuit has addressed the reliance issue in § 523(a)(2) litigation several times, most recently holding that "the Sixth Circuit has neither wholly rejected the duty to investigate, nor carved out a single, narrow exception for red flags." *Bomis v. National Union Fire Ins. Co.,* No. 93–1014, 1994 WL 201885, at *4 (6th Cir. May 23, 1994). The Sixth Circuit previously cited with approval the Seventh Circuit's view that reasonable or justifiable reliance does not require the court to undertake a subjective evaluation of a creditor's lending policy and practices. *BancBoston Mortgage Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir.1992), *cert. denied,* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993) (citing *Northern Trust Co. v. Garman (In re Garman),* 643 F.2d 1252, 1256 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981)).

In *Woolum,* which was announced in the context of an initial credit application, the Sixth Circuit stated that "[o]nce it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" *Woolum,* 979 F.2d at 76 (quoting *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1166 (6th Cir.1985)). This reasoning, which is equally applicable in the § 523(a)(2)(B) extension context, is consistent with the Sixth Circuit decisions not to second-guess established banking policies. *Id.* (citing to *Northern Trust Co. v. Garman (In re Garman),* 643 F.2d 1252, 1256 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981)); *Ledford,* 970 F.2d at 1560 (same).

The bankruptcy judge addressed the question of "red flags" by stating that:

Certainly there were questions raised by the personal financial statement....

I think, though, that the points that the debtor raises miss the point. The question is the purpose for which the personal financial statement was requested, and the purpose for which it was used, and taking into account that purpose, it seems to me that the bank's reliance was reasonable as a practical manner. This is not a question of a new loan being made that had any bearing on a net worth of $27 million.... [T]his is a situation where the alternatives before the bank were to call a loan that appeared to be under water from a collateral basis or attempt to obtain a restructuring from an individual.... So it seems to me that the bank, in the context of determining whether to forbear and attempt to work the matter out as a common sense matter, relied reasonably on this financial statement.

(Tr. vol. 3, at 13–16.)

The bankruptcy court's determination that National City reasonably relied upon the Debtor's materially false financial statement is supported by the record, is in accordance with applicable precedent, and is not clearly erroneous.

## C. DAMAGES

### 1. If all the requirements of § 523(a)(2)(B) have been satisfied, is the nondischargeable amount the entire debt plus interest?

The Debtor's final argument asserts that the bankruptcy court erred on the issue of damages by determining the entire debt, plus interest, nondischargeable. The Debtor urges the Panel to follow the reasoning of several bankruptcy courts that have required the creditor in § 523(a)(2) litigation to prove the specific damages caused by reliance on a debtor's false financial statement. These courts generally rely on the language "to the extent obtained by" in § 523(a)(2) to require a showing of causation and damages. *Bombardier Capital, Inc. v. Baietti (In re Baietti),* 189 B.R. 549, 558 (Bankr.D.Me.1995); *Star Bank, N.A. v. Reveal (In re Reveal),* 148 B.R. 288, 293 (Bankr.S.D.Ohio 1992);

*Horowitz Fin. Corp. v. Hall* (*In re Hall*), 109 B.R. 149, 153 (Bankr.W.D.Pa.1990); *Barclays American/Business Credit, Inc. v. Long* (*In re Long*), 44 B.R. 300, 309 (Bankr. D.Minn.1983).

The court's oral decision provides:

There's no clear evidence as to what extent, if any, the bank lost money because it waited and didn't make a demand in April 1991 or at some point earlier—or at some point later, rather—after it had received the financial statement.... [T]his then becomes a legal question as to whether or not there is a legal requirement that the bank show actual money lost because of waiting. And the courts appear to be coming rather clear and unified on the view that there is no such requirement. Most courts which have considered the question have viewed it primarily as a matter of straightforward statutory interpretation.... So it appears to me a that there is no other damage requirement that need be shown for nondischargeability under 523(a)(2)(B) other than showing that there was an extension based upon the false statement.

(Tr. vol. 3, at 18–20.)

 The bankruptcy judge relied on four Court of Appeals cases that hold similarly. *See In re McFarland,* 84 F.3d 943, 947 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *Norris v. First Nat'l Bank* (*In re Norris*), 70 F.3d 27, 39–30 n. 6 (5th Cir.1995); *Shawmut Bank, N.A. v. Goodrich* (*In re Goodrich*), 999 F.2d 22, 26 (1st Cir.1993); *John Deere Co. v. Gerlach* (*In re Gerlach*), 897 F.2d 1048, 1051 (10th Cir. 1990). *Accord Wolf v. Campbell,* 211 B.R. 14 (E.D.Mich. Apr. 1, 1997). *But see Siriani v. Northwestern Nat'l Ins. Co.* (*In re Siriani*), 967 F.2d 302, 304 (9th Cir.1992). For the reasons stated by the majority of the cases, and by the bankruptcy court in this case, the Panel agrees that National City is not required to show causation and damages in order to have the debt declared nondischargeable under § 523(a)(2)(B).

 In addition, as to the amount of the actual debt, the bankruptcy court correctly refused to relitigate issues finally determined by the state courts. The Sixth Circuit recently considered this issue and concluded that § 1738 of Title 28 requires federal courts to give full faith and credit to state court judgments that would have had preclusive effect on courts within that state, unless Congress has directed otherwise. *Bay Area Factors v. Calvert* (*In re Calvert*), 105 F.3d 315, 317–22 (6th Cir.1997) (relying on *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380–386, 105 S.Ct. 1327, 1331–1335, 84 L.Ed.2d 274 (1985)). Section 1738 states:

The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto. ·

The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

28 U.S.C. § 1738 (1994).

In *Calvert,* the Sixth Circuit considered whether a default judgment from a California state court should be given preclusive effect in dischargeability proceedings in a bankruptcy court. *Calvert,* 105 F.3d at 317. The court adopted a two-step analysis: First, what preclusive effect, if any, would the state of origin give the judgment? Second, is there any bankruptcy exception? *Id.* After examining the underlying state law and concluding that the default judgment would have barred further state court action under collateral estoppel principles, the Sixth Circuit considered whether bankruptcy discharge proceedings qualify as an exception to

§ 1738. *Id.* at 318. The Circuit concluded that " 'collateral estoppel principles ... apply in discharge exception proceedings pursuant to § 523(a).' " *Id.* (citing *Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991)). The court concluded that state court judgments, including default judgments, that would have been given preclusive effect in their state of origin, regardless of whether or not "the important issues were actually litigated in the prior proceeding," would be given preclusive effect in bankruptcy discharge exception proceedings. *Id.* In so doing, the Circuit broke from its previous expression in *Spilman v. Harley,* 656 F.2d 224, 228 (6th Cir.1981), which referred to issues which "were actually litigated."

*Calvert* is controlling with respect to the amount of the judgement. *See Corzin v. Fordu (In re Fordu* ), 209 B.R. 854, 861–64 (6th Cir. BAP 1997) (discussing preclusion principles and Ohio law). The Ohio appellate court affirmed the trial court's grant of summary judgment on the issue of the Debtor's liability, and the trial court determined that liability to be $1,448,808.63 with interest at the rate of 7% from November 5, 1993. *See National City Bank v. Plechaty Cos.,* 104 Ohio App.3d 109, 661 N.E.2d 227 (affirming the trial court's grant of summary judgment on the issue of the Debtor's liability), *appeal denied,* 74 Ohio St.3d 1422, 655 N.E.2d 741 (1995). Ohio courts would apply collateral estoppel in the matter of the Debtor's liability on the note, as "it was 'actually litigated and determined,' and the determination was essential to the judgment." *Fordu,* 209 B.R. at 862 (quoting *Shelar v. Shelar,* 910 F.Supp. 1307, 1312 (N.D.Ohio 1995)). The bankruptcy court must as well. *Calvert,* 105 F.3d at 317–18.

## V. CONCLUSION

The judgment of the bankruptcy court that the debt owed by Appellant, Debtor Ben L. Plechaty, to Appellee, National City Bank, is nondischargeable in the amount determined in the Ohio court action is **AFFIRMED.**